# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

(1) SHARON ONWUAGBA, as  
Administrator for the ESTATE OF  
JAIMESSE SAD'E THOMPSON,  
                  Plaintiff,

v.

(1) GARFIELD COUNTY CRIMINAL JUSTICE  
AUTHORITY, ("GCCJA") an  
Oklahoma Title 60 authority;

(2) BOARD OF COUNTY COMMISSIONERS  
of The County of Garfield, a Political  
Subdivision of the State of Oklahoma;

(3) BEN CROOKS, individually and  
in his official capacity as Jail Administrator  
of the Garfield County jail;

(4) JOHN/JANE DOES, unknown individuals who  
were involved but not yet identified,

(5) MONA LONGHURST, MCP, LPC, LADC  
and in her individual capacity.

(6) LINDA HOPE DILLING, APRN, CNS  
and in her individual capacity.  
                  Defendants.

CIV-22-989-D

**JURY DEMANDED**

## COMPLAINT

COMES NOW Plaintiff, Sharon Onwuagba, as Administrator of the Estate of Jaimesse Sad'e Thompson, Deceased, through her attorneys of record, Ronald "Skip" Kelly and Debra K. Hampton, alleges and states:

1

**Jurisdiction and Venue**

1. This case arises under 42 U.S.C. § 1983, This Court has subject matter jurisdiction over Jaimesse Sad'e Thompson's federal civil rights claims under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court also has jurisdiction under Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

2. Venue is proper under 28 U.S.C. § 1391 (b) because the events and omissions giving rise to this Complaint occurred in Garfield County, Oklahoma.

3. That the matter in controversy exceeds $75,000, exclusive of costs and interest.

4. Plaintiff is now, and was always, a resident of Garfield County, State of Oklahoma. (Plaintiff's decedent shall be called "Jaimesse Sad'e Thompson" or "decedent" or "Ms. Thompson.").

5. Sharon Onwuagba is the court-appointed Administrator of the Estate of Jaimesse Sad'e Thompson, Deceased, by virtue of Letters of Administration issued to her in case number PB-2021-120 in the District Court of Garfield County, State of Oklahoma.

6. Garfield County Criminal Justice Authority ("GCCJA") which is a public trust created pursuant to Title 60, Oklahoma Statutes 2001, §§ 176 to 180, a political subdivision of the State of Oklahoma and is responsible for oversight over the Garfield County Detention Center ("Jail"). The term "person" means an individual, a corporation, a partnership, an association, a joint-stock company, a trust, any unincorporated organization, or a government or political subdivision thereof. As used in this paragraph

the term "trust" shall include only a trust where the interest or interests of the beneficiary or beneficiaries are evidenced by a security. 15 U.S.C. § 77b (a)(2)

7.Board of County Commissioners of the County of Garfield ("BOCC") is a political subdivision of the State of Oklahoma and a responsible for the jail and is properly named under Title 19 O.S. §4.

8.Defendant, Ben Crooks, is and was at all times pertinent to this action the Jail Administrator or Detention Administrator of Garfield County, Oklahoma, a political subdivision of the State of Oklahoma, and is responsible for the operation of the GCDC. Ben Crooks is sued in both his individual capacity and official capacity for acts performed while he was the Jail Administrator of Garfield County. At all times relevant herein, Ben Crooks was acting under the color of law and within the course and scope of his employment with Garfield County, State of Oklahoma. Defendant Crooks was responsible for the agreement Garfield County reached with the Department of Justice Memorandum of agreement regarding the conditions of the jail that was signed on April 29, 2008.

9.Mona Longhurst, MCP, LPC, LADC, and in her individual capacity was acting under the color of law and within the course and scope of her employment was responsible for adequate mental health diagnosis.

10.Linda Hope Dilling, APRN,CNS, and in her individual capacity was acting under the color of law and within the course and scope of her employment was responsible for adequate mental health diagnosis.

11. Defendants, John/Jane Doe(s) represent other persons whose identities are not yet known but caused or contributed to Jaimesse Sad'e Thompson's death by virtue of their position, acting under the color of law, negligence and intentional conduct being deliberately indifferent failed to take remedial action when any reasonable person would have recognized that Ms. Thompson needed psychiatric care. The deliberate indifference violated Ms. Thompson's Fourteenth Amendment rights under the United States Constitution.

12. Defendants' conduct was under color of state law within the meaning of 42 U.S.C. § 1983.

13. Defendants violated the Americans with Disabilities Act (ADA) which prohibits discrimination against people with disabilities such as Ms. Thompson.

14. For § 1983 purposes, courts analyze these situations as either a―condition of confinement case or as one involving an―episodic act or omission.

15. Ms. Thompson had a long list of serious factors that indicated that she was a high risk of suicide, including a history severe depression,

16. At all material times, Jaimesse Sad'e Thompson was a resident of Garfield County, State of Oklahoma.

**Factual Background**

17. On February 25, 2020, the District Court of Garfield County issued an Order for Determination of Competency in Case No. CM-2020-10, see these footnotes for docket

entries. ([1])([2])

18.     On March 13, 2020, Ms. Thompson was examined, and it was reported by the examiner that: Garfield County Jail reported according to nurse personnel of the jail, Ms. Thompson was not being prescribed any medication for medical reasons or psychiatric medication for mental health. Ms. Thompson reported being seen in counseling while she was in public school for several years from 5th grade to 9th grade for family problems. She reports receiving counseling while in prison around 2017. Ms. Thompson denies ever receiving any inpatient mental health treatment for suicidal issues.

19.     On April 28, 2020, Linda Hope Dilling, APRN, CNS noted, that: Ms. Thompson's "mother had said that patient stated that she wanted to kill herself at home earlier today and was hearing voices telling her to kill herself and did try to kill herself in jail. Patient denied." Now, Ms. Thompson succeeded at the suicide threat and was obviously having problems at the time with suicidal ideation by evidence presented by her mother.

20.     However, Ms. Thompson was diagnosed with a Personality Disorder, but there were no specific findings of what type of Personality Disorder she may have had. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) lists 10 types of personality disorders, although most patients who meet criteria for one type also

---

[1] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=garfield&number=CM-2020-10&cmid=433288

[2] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=garfield&number=CM-2019-1078&cmid=432342

meet criteria for one or more others. Some types (e.g., antisocial, borderline) tend to lessen or resolve as people age; others (e.g., obsessive-compulsive, schizotypal) are less likely to do so. Personality disorders in general are pervasive, enduring patterns of thinking, perceiving, reacting, and relating that cause significant distress or functional impairment. Personality disorders vary significantly in their manifestations, but all are believed to be caused by a combination of genetic and environmental factors.

21. On October 5, 2020, the District Court of Garfield County issued a Second Order for Determination of Competency in CF-2020-178. This Court may take judicial notice under Fed. R. Evid. 201(b) of www.oscn.net at the link below[3].

22. On October 26, 2020, mental health records from Northwest Center for Behavior Health, Outpatient Office, Enid, Oklahoma, from dates of 03/09/2020 to 03/13/2020 and 04/20/2020 to 08/24/2020. The report indicates that Ms. Thompson was opened as a client on 03/09/2020 and discharged on 03/13/2020. She was opened for a competency evaluation to be completed and documented. She was diagnosed with adjustment disorder with no further explanation according to documents.

23. Ms. Thompson was also opened as a client again on 04/20/2020 and discharged on 08/24/2020. It was stated the reasoning for opening her as a client was due to reported depression, anxiety, hallucinations and reported substance abuse which was reported to be in remission. She was seen for intake, psychiatrist medication evaluation,

---

[3] https://www.oscn.net/dockets/GetCaseInformation.aspx?db=garfield&number=CF-2020-178&cmid=436044

case management and discharged due to client having a lack of contact with the office. It is unknown what medications Ms. Thompson was prescribed. She was diagnosed with Anxiety Disorder, Depressive Disorder, Hallucinations and Substance Abuse in remission.

24. Longhurst reported that "Ms. Thompson does not espouse any delusions (firm false beliefs despite evidence to the contrary)." Even though Longhurst stated that "Ms. Thompson reports that she is currently almost 9 months pregnant and reports that although she has tested negative on a pregnancy test, she reports that a doctor who has examined her, has confirmed her pregnancy." Since Ms. Thompson was not pregnant according to any finding of the Medical Examiner and a pregnancy test was negative Ms. Longhurst could not make the opinion Ms. Thompson did not have "firm false beliefs."[4]

> "Fixed" refers to the strength of the patient's belief. The patient is certain, and not persuaded by any arguments to the contrary.
>
> "False" relates to the veracity of the patient's belief. "Idiosyncratic" means the belief is characteristic of the individual patient.

25. Longhurst reported that "In terms of employment history, Ms. Thompson reports previous employment Mid Continent in January 2019 for 2 months. She reports being employed by Subway for 7 days in 2018." This questions the reliability that Ms. Thompson had no reasons for treatment or was a person requiring treatment.

---

[4] A delusion is a fixed false belief based on an inaccurate interpretation of an external reality despite evidence to the contrary. The belief is not congruent with one's culture or subculture, and almost everyone else knows it to be false.

26. The deceased was booked into the jail on May 6, 2020, for several issues she had with her mother Sharon Onwuagba. At the time of the incident Ms. Thompson was displaying signs she was a "Person requiring treatment" as defined by Oklahoma statues 43A O.S. § 1-103 (13)(a) which means a person who because of his or her mental illness or drug or alcohol dependency:

(1) poses a substantial risk of immediate physical harm to self as manifested by evidence or serious threats of or attempts at suicide or other significant self-inflicted bodily harm,

(2) poses a substantial risk of immediate physical harm to another person or persons as manifested by evidence of violent behavior directed toward another person or persons,

(3) has placed another person or persons in a reasonable fear of violent behavior directed towards such person or persons or serious physical harm to them as manifested by serious and immediate threats,

(4) is in a condition of severe deterioration such that, without immediate intervention, there exists a substantial risk that severe impairment or injury will result to the person, or

(5) poses a substantial risk of immediate serious physical injury to self or death as manifested by evidence that the person is unable to provide for and is not providing for his or her basic physical needs.

27. Ms. Thompson was housed from May 6, 2020, to her death November 15, 2020. Ms. Thompson was housed in isolation for over 180 days in the jail for reasons unknown to the undersigned. However, there are letters that were written by Ms. Thompson that will later be introduced with discovery. On December 4, 2020, the Medical Examiner determined the cause of death to be ligature asphyxiation due to hanging. Deputy Chase Becenti was dispatched to the jail at approximately 1714 hours in reference to a Medical

Emergency involving Ms. Thompson. The investigation that ensued as a result shows that Ms. Thompson's death could have been prevented and that jail staff failed to protect her or have sufficient screening standards.

28. Officer Chase Becenti wrote in a report that on the following day, November 16, 2020, he collected recordings of phone calls Ms. Thompson had made between October 24, 2020, and November 10, 2020. He collected Jail camera footage of the incident and detention staff reports. Next is important to the failure to protect claim, but that Ms. Thompson had a genuine issue with mental health problems. Officer Chase Becenti wrote:

> I listened to the phone calls and in a phone, call made on 11/07/2020 at 2224 hours to the phone number 580/278/2314 Jaimesse makes the statement "Oh my god, I'm ready to come home I'm about to kill myself," The person Jaimesse is believed to be a Shyesha Scott due to her referencing the person as such in previous calls to that phone number and from referencing visitation logs. I then reviewed the video footage from the incident, The camera footage time is in 12 hr. time, at 5:11 PM Detention Office Taylor Weber is seen entering E-Pod and checking cells as he goes. Taylor stops at E-4 and enters.

At 5:12 PM Detention Officers Cameron Foster and Anthony Estrada enter E-Pod to assist.

At 5:13 PM Detention Officer Vanessa Eden and the jail nurse Melissa Olalde LPN enter E-Pod followed by Detention officers Stanley Deleon and Desmond Beasley.

At 5:17 PM the AED was brought to Cell E-4.

At 5:18 PM Ben Crooks enters E-Pod.

At 5:25 PM EMS arrives on E-Pod and begins assisting,

At 5:36 PM Garfield County Deputies arrive in E-Pod .

At 5:45 PM EMS Leaves E-Pod with Jaimesse on gurney.

29. Deputy Chase Becenti spoke to Courtney Flowers, an inmate at the jail, who advised him that Ms. Thompson had been acting strange starting Friday, November 13,

2020. Courtney stated that Jaimesse had been laying underneath her bunk on the floor, Courtney stated that the day of Ms. Thompson's death that Ms. Thompson's lights were covered which was unusual. Courtney then stated that right after med pass she saw Ms. Thompson sitting on the edge of her bunk with feet down and stated that the time was right at 4:30PM. Courtney also made that statement that several people were leery about going near Ms. Thompson's cell due to not knowing what mood she would be in. He asked Courtney about the Jail Check that had come through and if there was anything strange or not normal about it. She stated the only thing out of place about it was they didn't tell Ms. Thompson to uncover her lights. I then asked if Courtney would like to complete a written statement and she did. That statement has not been provided to counsel.

## Trust Obligations

### Security and Protection from Harm

30.     The Trust shall continue to develop and implement policies, procedures and practices to provide a reasonably safe and secure environment for all detainees.

### Screening and Specialty Care Referrals

31.     The Trust shall prepare an adequate initial health screening form and conduct medical health intake screening of all detainees promptly not to exceed twelve hours from the time of initial booking. The completed screening form shall become the first document included in the detainee's medical record. The screen shall include, among other things, specific questions with respect to current symptoms and history of contagious disease consistent with generally accepted professional standards. The Trust shall make

appropriate referrals for evaluation, testing and treatment based on information provided in the screening.

**Classification and Housing**

32.     The Trust shall develop and implement an objective classification system and house detainees accordingly. The Trust shall ensure, at a minimum, that maximum security detainees are not housed with minimum security detainees.

**Suicide Prevention**

33.     The Trust shall reconfigure or remove known suicide hazards from the cells and living areas, including specifically, handicap handrails that allow material to be tied through an open area of the railing in cells.

34.     The Trust shall fully document irregularly timed cell checks four times per hour for inmates identified as being at heightened risk of suicide. The Trust shall ensure that, where appropriate, such inmates receive constant monitoring.

35.     The Trust shall provide security staff with access to readily available, safely secured, suicide cut-down tools.

36.     The Trust shall continue to develop and implement written comprehensive site-specific policies and procedures governing medical, dental and **mental health care** that conform with generally accepted community standards.

37.     The Trust shall secure the services of a Qualified Medical Professional to be in charge of medical care at the Jail. The Qualified Medical Professional's duties shall include supervising all medical care rendered to detainees; supervising physician's

assistant sick call or providing physician's sick call; reviewing medical intake screening forms and processes ensuring that all inmates receive a health assessment, and monitoring care of serious and/or chronic conditions. Inmates shall continue to receive adequate and timely access to dental care.

### Mental Health Care

38. The Trust shall provide detainees with timely and appropriate mental health care consistent with generally accepted community standards.

39. The Trust shall continue to provide every detainee with an initial mental health screening within a reasonable time after intake at the Jail. The Trust shall continue to perform mental health evaluations for all detainees whose histories or whose responses to initial screening questions indicate a need for such an evaluation.

### First Cause of Action, Deliberate Indifference, a Fourteenth Amendment Violation

40. Defendants had a duty to provide Ms. Thompson with reasonable psychiatric and medical care and failing to do so was deliberately indifference to her medical needs.

### Violation of Civil Rights-42 U.S.C. 1983

41. Defendants deprived Ms. Thompson of rights and privileges afforded to her under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution in violation of 42 U.S.C., § 1983.

42. Defendants have an affirmative duty to protect inmates from present and continuing harm and to ensure they receive adequate food, clothing, shelter, and medical care.

43. Defendant Ben Crooks had a duty to establish training requirements to comply with state and federal standards and the previous agreement that Garfield County reached with the Department of Justice memorandum of agreement regarding the conditions of the jail that was signed on April 29, 2008. Defendant Ben Crooks is also responsible for the administration and supervisory control involving the operations of the jail. Defendant Ben Crooks is also responsible for a.) reviewing that appropriate disciplinary actions taken were in compliance with established procedures, b.) overseeing that an inmate's medical needs were met and were in compliance with established policies; and c.) reviewing and approving all incident reports and forwarding accurate and completed reports to the Sheriff with appropriate recommendations.

44. Defendants' failure to adequately attend to Ms. Thompson's serious psychiatric condition resulted in her experiencing unnecessary pain.

45. Defendants' failure to adequately attend to Ms. Thompson's serious psychiatric condition caused or contributed to her death.

46. Defendants' failure to adequately attend to Ms. Thompson's serious psychiatric condition was in violation of the Eighth and Fourteenth Amendment.

47. Defendants' conduct evinced a deliberate indifference to the serious psychiatric needs and safety of Ms. Thompson.

48. Defendants knew, or should have known, that failure to follow proper protocol in dealing with psychiatric inmates and/or detainees caused or contributed to her death.

49. Defendants exhibited a reckless disregard for the safety and welfare of the inmates detained at the jail when they continued to use force against Ms. Thompson despite her psychiatric condition.

50. Defendants' conduct violated clearly established constitutional rights which a reasonable person in their position would have known.

51. Defendants had an obligation to ensure that all detainees at the jail received reasonable psychiatric care and in failing to take any action to protect Ms. Thompson, each of the Defendants acted with deliberate indifference to the safety and Constitutional rights of Ms. Thompson because it is clear and convincing that Ms. Thompson did not receive adequate mental health care.

52. That the above acts or omissions by Defendants are sufficiently harmful to evidence a deliberate indifference to Ms. Thompson's serious psychiatric and medical needs.

## RELIEF REQUESTED

Plaintiff respectfully requests this Court enter Judgment against Defendants for actual and compensatory damages in excess of $5,000.000.00, award punitive damages, attorney fees, costs, and all other relief the Court deems just and equitable.

5:22-cv-00989-D

Respectfully submitted,


/s/ RONALD "SKIP" KELLY
RONALD "SKIP" KELLY, OBA # 4976
205 NW 63rd St., Ste. 150
Oklahoma City, OK
73116 (405) 235-1976
(405) 286-6316 (fax)
kellyron01@yahoo.com
ATTORNEY FOR LAINTIFF


/s/ DEBRA K. HAMPTON
DEBRA K. HAMPTON, OBA # 13621
Hampton Law Office, PLLC
3126 S. Blvd., # 304
Edmond, OK 73013
(405) 250-0966
(866) 251-4898 (fax)
hamptonlaw@cox.net
ATTORNEY FOR PLAINTIFF

15